DELBELLO DONNELLAN WEINGARTEN
WISE & WIEDEKEHR, LLP
*Attorneys for the Debtor*
1 North Lexington Avenue
White Plains, New York 10601
(914) 681-0200
Jonathan S. Pasternak, Esq.
Erica Feynman Aisner, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

In re:                                                      Chapter 11
                                                            Case No. 12-14415 (REG)

189 AVEC MOI LLC,

                                    Debtor.
--------------------------------------------------------------X

## FIRST AMENDED DISCLOSURE STATEMENT

189 Avec Moi LLC (the "Debtor") submits this First Amended Disclosure Statement

pursuant to Section 1125(b) of Title 11, United States Code, 11 U.S.C. §§ et seq. (the

"Bankruptcy Code") and Rule 3017 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), in connection with its First Amended Liquidating Chapter 11 Plan, dated

June 11, 2013 (the "Plan") to all known holders of Claims against or Interests in the Debtor in

order to adequately disclose information deemed to be material, important and necessary for the

Debtor's creditors to make a reasonably informed judgment about the Plan.  A copy of the Plan

is attached hereto as Exhibit "A."

The Bankruptcy Court has approved this Disclosure Statement in this chapter 11 case

under Section 1125(b) of the Bankruptcy Code and has scheduled a hearing on confirmation of

the Plan for July 17, 2013 at 9:45 a.m. (the "Hearing").  Under Section 1126(b) of the

Bankruptcy Code, only Classes[1] of Allowed Claims that are "impaired" under the Plan, as

defined by Section 1124 of the Bankruptcy Code, are entitled to vote on the Plan. Generally, a

Class is impaired if its legal, contractual or equitable rights are altered or reduced under the Plan.

Under the Plan, Classes 1 and 2 are impaired and thus entitled to vote. Class 3 Interest holders

will retain their Interests and, therefore, also unimpaired under the Plan and deemed to have

accepted the Plan.

## I. INTRODUCTION

**A. Background**

    The Debtor is a New York limited liability company formed in 2004. The Debtor is a

single asset real estate entity  that has an interest in a 99 year lease for a property located at 189

Avenue C in the lower east side of New York City. The Debtor constructed and operates a

residential apartment building (the "Building") on the premises that consists of thirty-five (35)

residential rental units (which are currently rented), one storefront unit and a community space.

    In or about 2005, the Debtor's principal began negotiating with Landlord for a land lease

which contemplated the construction of the Building and the 99 year lease between the Debtor

and Landlord was executed on March 1, 2006.  In or about the summer of 2006, excavation and

demolition at the Premises began which was funded solely with capital contributions from the

members of the Debtor. The initial start-up capital was collectively approximately $2 million. By

December, 2006, the excavation and demolition work was completed and the foundation was in

place. It was at this point that the Debtor sought institutional financing for the construction of the

Building.

---

1 Capitalized terms not defined herein have the same meaning ascribed to them in the Plan.

The Debtor obtained a construction loan in the amount of $7.8 million dollars from the Bank of Smithtown ("BOS") in or about the spring of 2007. The Debtor anticipated this loan to be more than sufficient to cover $7 million dollar hard costs for the construction of the Building, as contracted.

The Debtor was also responsible to continue monthly rent payments to the Landlord including real estate taxes, insurance and the costs of its own consultants relating to the ongoing construction. The cost of these items, among others, was borne by the Debtor's own capital. The total cost of construction (both hard and soft costs) was estimated to be $10 million dollars.

As the summer of 2007 neared, the Debtor became concerned about the financial ability of the general contractor to complete the project. The same contractor was working on another construction project for an affiliate of the Debtor,[2] and he had made several demands for monies above the contract price in order to enable him to complete that project. Although the contractor had not made such a request at the Debtor's project, the financial troubles of the contractor were apparent. In the summer of 2007, the general contractor ran out of money and "walked off" the Debtor's project. At this point the contractor had been paid approximately $2 million dollars and the structural steel for the first floor of the Building was about to be delivered. The contractor "pulled" all of his building permits with the NYC Department of Buildings ("DOB") and the project was shut down completely.

The Debtor's principal took over the construction of the Building by stepping in as the general contractor in an effort to mitigate the economic losses and to expedite the completion of the project. In or about late fall, 2007, after approximately four (4) months of work to get the

project back on-line, getting new permits, hiring and mobilizing various tradesmen, the project was again underway. During this down time in construction, the Debtor continued to employ its project manager and pay the basic carrying costs for the project (insurance, rent, taxes) notwithstanding the major delays.

As a result of the unanticipated delays and cost overruns, in or about March, 2008, the Debtor sought additional financing from BOS in the amount of $1.08 million.

The project progressed for a few months without interruption, with the exception of weather (winter time) until Spring, 2008 when Claremont East 12, LLC ("Claremont"), also a tenant of the Landlord residing on the adjoining property located at 646-652 East 12th Street, New York, NY, commenced a litigation, first against Landlord and then through a second litigation, against the Debtor.

Claremont alleged that the Debtor violated its development rights conveyed to it by the Landlord pursuant to the Lease. Claremont also filed a Notice of Pendency against the underlying real property. Ultimately this litigation resulted in BOS refusing to fund further construction in the face of litigation and the DOB issued a stop work order with the intention to revoke all permits because of the zoning claims asserted by Claremont. Construction was shut down again!

The litigation with Claremont proceeded for many months while the Debtor continued to incur the continued costs of the stalled project. In or about September 2008, the Debtor borrowed an additional $750,000 from private lenders.  This was in addition to approximately $2.3 million in *additional* capital contributions from the Debtor's members throughout the project.  It was not

---

2  The Debtor's affiliate, Three On Two Fourteen, LLC, is currently a Chapter 11 debtor in a case pending in the

until the fall of 2009 when the litigation was finally settled and construction could resume.

Unfortunately the Debtor's funds were depleted and it was again in need of additional funds to complete the construction. On or about September, 2009, the Debtor secured an additional $870,000 financing from BOS (although substantially less than that amount was realized from the new loan) which it had hoped would be sufficient; however, this was not the case.

In or about the summer of 2010, an additional $900,000 in financing was obtained from private lenders in the form of unsecured notes which were intended to be short term bridge loans as they carry high interest rates. Finally in March of 2011, the construction was substantially completed and the first tenant took occupancy.

Although "punchlist" items continued to be worked on through November, 2011, the Debtor, with the assistance of its leasing broker, Ozymandius Realty, in March of 2011, began marketing the Building for lease. Much like the rest of this project, leasing also did not go as anticipated and the Debtor was forced to offer incentives to attract prospective tenants. To wit, the Debtor offered to pay all broker fees and give one month of free rent in order to incentivize tenants to lease. These incentives, while effective, came at a significant cost to the Debtor which will take time to recoup. However, the Debtor and its leasing agent have now successfully rented all of the residential units.

Although the Debtor successfully leased all thirty-five (35) of the residential units, the construction delays, significant cost overruns and unanticipated additional financing, left the Debtor with minimal capital and no ability to satisfy its matured loan obligations to its secured

Eastern District of New York, Case No. 12-46404 (JF),

5

lender.

The Debtor tried diligently to negotiate with Peoples in an effort to either reduce the overall indebtedness and/ or to restructure or extend the maturity of the loan. At the same time, the Debtor began efforts to sell the Property. However, Peoples refused all of the Debtor's proposals and ultimately commenced a foreclosure action**.**

The Debtor filed this chapter 11 case to preserve and maximize the value of the Property, which has significant equity, through a traditional marketing and sale process and to avoid a foreclosure sale which would yield far less in sale proceeds to the detriment of all the other creditors of the estate.

**B. Commencement of the Chapter 11 Case**

On October 26, 2012 (the "Petition Date"), the Debtor filed a voluntary petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code. The Debtor has continued in possession of its property and the management of its business affairs as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**C.  Employment of the Debtor's Professionals**

On the Petition Date, the Debtor filed an application to retain Rattet Pasternak, LLP ("RP"), as its bankruptcy counsel. By order of the Bankruptcy Court dated December 17, 2012, the Bankruptcy Court approved the retention of RP, *nunc pro tunc,* to the Petition Date.

On January 14, 2013, the Bankruptcy Court entered an Order authorizing the substitution of DelBello Donnellan Weingarten Wise & Wiederkehr, LLP, as counsel for the Debtor, *nunc pro tunc*, as of January 1, 2013.

**D. Filing of Schedules of Assets and Liabilities and Statement of Financial Affairs**

On November 28, 2012 the Debtor filed its Schedules of Assets and Liabilities, together with its Statement of Financial Affairs (collectively, the "Schedules"). The Debtor's Schedules are available on the Bankruptcy Court's website: www.nysb.uscourts.gov (log-in and password required) or from counsel for the Debtor upon written request.

**E. Establishment of a Claims Bar Date and Claims Process**

Pursuant to an order of the Bankruptcy Court entered on January 14, 2013, February 25, 2013 was established as the last date by which creditors may file proofs of claim in the Chapter 11 case (the "Bar Date"), and subsequently notice of the Bar Date was served on all creditors listed on the Debtor's creditor matrix filed with the Bankruptcy Court as well as parties filing notices of appearance and creditors who had previously filed a proof of claim in the case.

The Debtor, together with counsel, has reviewed all Claims filed and does not anticipate filing any objections to any claims filed in the case.

**F. The Sale of the Property**

During the case, the Debtor has continued to market the Property through a variety of channels. Through the Debtor's contacts in the local New York City real estate market and the contacts of the Debtor's various professionals, a number of negotiations have taken place with parties interested in buying the Property. While the Debtor has yet to accept an offer to purchase, based upon the offers received to date, the Debtor is optimistic that a sale can and will be achieved shortly.

Recently, the Debtor has decided to engage the services of a large scale real estate broker in order to market the Property for sale. This engagement has been discussed with SFGC, as

assignee of People's, and will be pursued with its support.

## G. Post-Petition Operations

The Debtor has continued to manage the Property which includes maintenance of the

Building, entering into new leases for residential units turned over and maintaining 100%

residential occupancy. These operations have been funded solely through rents collected,

pursuant to a consensual cash collateral budget with SFGC. The Debtor has also continued to

remit adequate protection payments to SFGC.

## II.  THE PLAN OF REORGANIZATION

THE FOLLOWING IS A BRIEF SUMMARY OF THE PLAN. THE PLAN
REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT AND CREDITORS ARE
URGED TO CONSULT WITH THEIR COUNSEL IN ORDER TO FULLY UNDERSTAND
THE PLAN AND TO MAKE AN INTELLIGENT JUDGMENT CONCERNING IT. THE
PLAN GOVERNS OVER ANY DISCREPANCY IN THIS SUMMARY.

The Plan will be funded with the Debtor's cash on hand and the net proceeds from the

sale of the Debtor's Property. The sale of the Debtor's Property and related assumption and

assignment of the Ground Lease and Subleases (as more fully discussed in Article XIII of the

Plan),  following Confirmation of the Plan, shall not be subject to any stamp or similar transfer

tax pursuant to 11 U.S.C. § 1146(a) because it will be sold under the Plan.

### A.    Treatment of Unclassified Claims Under the Plan

1.    Allowed Administrative Claims other than Claims of Professionals:  The Debtor

has remained current in its post-Petition Date expenses and, therefore, does not anticipate any

Allowed Administrative Claims other than those of the Debtor's Professionals at Confirmation.

However, to the extent that any such Claims should exist, they shall be paid in the ordinary

course and according to the terms and conditions of the respective contracts underlying such Claims.

2.      <u>Allowed Administrative Claims of Professionals</u>:  Allowed Administrative Claims of professionals shall be paid, in full, in cash, upon the later of (i) allowance by the Court pursuant to Section 330 of the Bankruptcy Code or (ii) the Effective Date, unless otherwise agreed to by such professionals and subject to the certain "carveout" agreed to by SFGD and set forth in Section 4.2(f) of the Plan, if applicable. The only Allowed Administrative Claims are those of (i) Debtor's former counsel, Rattet Pasternak, LLP, and (ii) Debtor's counsel, DelBello Donnellan Weingarten Wise & Wiederkehr, LLP. The Allowed Administrative Claims of Rattet Pasternak, LLP is –$4,189.97 (which is net of the Debtor's pre-Petition Date retainer)[3] and DelBello Donnellan Weingarten Wise & Wiederkehr, LLP is approximately $65,000 (which is estimated through the Confirmation Date).

3.      <u>United States Trustee's Fees</u>: Under the Plan, all United States Trustee statutory fees arising under 28 U.S.C. § 1930 and 31 U.S.C. §3717 prior to Confirmation shall be payable by the Effective Date. Thereafter, such fees shall be paid in full, in cash, in such amount as incurred in the ordinary course of business by the Debtor.  The Debtor shall effectuate payment of United States Trustee quarterly fees through the entry of a final decree closing the case.

4.      <u>Allowed Priority Claims</u>:  The Debtor shall pay, in full and in cash, Allowed Priority Claims (entitled to Priority pursuant to Section 507(a)(8) of the Bankruptcy Code) within ten (10) days after the Effective Date. The Debtor does not believe that any such claims exist.

**B.**        **Treatment of Classes**

<u>Class 1 Secured Creditors:</u> the Allowed Secured Claim of SFGD, together with any

unpaid interest, costs and reasonable attorneys' fees accrued thereon through the Sale Closing

Date, shall be paid in full on the Sale Closing Date. Until such sale, SFGD shall receive monthly

adequate protection payments from the Debtor in the amount of $48,250, which shall be applied

to the SFGD Allowed Secured Claim. Interest shall accrue on the SFGD Allowed Secured Claim

at the rate of 7.25% per annum or per diem rate of $1,925 per day.  In the event that a Sale

Contract has not been executed on or before August 31, 2013 or the Sale Closing Date shall not

timely occur, the Debtor must either, (1) satisfy the Allowed Class 1 Claim in full, or (2) conduct

a public auction no later than October 31, 2013 and close on such transaction by November 25, ,

2013. SFGD shall have the right to Credit Bid the full amount of the SFGD Allowed Secured

Claim at an auction. The Debtor may request a thirty (30) day extension of either Sale Closing

Date from SFGD, the consent of which will not be unreasonably withheld.        The SFGD

Allowed Secured Claim impaired under the Plan under Section 1124 of the Bankruptcy Code.

<u>Class 2 Unsecured Creditors:</u>  Allowed Unsecured Claims against the Debtor shall

receive a pro rata portion of the remaining Distribution Fund and all available cash on hand, if

any, after the payment of all Administrative, Priority, post-Effective Date legal fees and  SFGD

Allowed Secured Claim (Class 1), within ten (10) business days of the Sale Closing Date. In the

event that the SFGD Allowed Secured Claim is satisfied absent and in lieu of a sale of the

Property or public auction under this Plan, Allowed Class 2 Claims shall receive up to 100% of

---

3 The Debtor's credit balance with Rattet Pasternak, LLP will be applied to the outstanding fees due to DelBello

their Allowed Claims, in cash, from the Debtor's operating cash flow except that all Allowed

Class 2 Claims must be paid in full upon any future sale or refinance of the Property. Class 2

Allowed Unsecured Claims are impaired and are permitted to vote on this Plan.

Class 3 Interests:  Allowed Interests shall retain their interest in the Debtor and shall

receive a pro rata portion of the remaining proceeds of the Distribution Fund and all available

cash on hand, after the payment of all unclassified Claims and Class 1 and Class 2 Allowed

Claims, based upon the particular percentage of Interest held.  Class 3 Interest holders are

unimpaired and are deemed to have accepted the Plan under Section 1124 and 1126 of the

Bankruptcy Code.

### C.    Resolution Of Disputed Claims & Reserves

(a)    Objections.  An objection to the allowance of a Claim shall be in writing and may

be filed with the Bankruptcy Court by the Debtor or any other party in interest no later than the

Confirmation Date.

(b)    Amendment of Claims.  A Claim may be amended after the Effective Date only as

agreed upon by the Debtor and the holder of such Claim and as approved by the Bankruptcy

Court or as otherwise permitted by the Bankruptcy Code and Bankruptcy Rules.

(c)    Reserve for Disputed Claims.  The Debtor shall reserve, on account of each

holder of a Disputed Claim, that property which would otherwise be distributable to the holder

on such date were the Disputed Claim at issue an Allowed Claim at the time of distribution, or

such other property as the holder of the Disputed Claim at issue and the Debtor may agree upon.

The property so reserved for the holder, to the extent that the Disputed Claim is Allowed, and

---

Donnellan Weingarten Wise & Wiederkehr, LLP, upon approval of such fees by the Bankruptcy Court.

only after the Disputed Claim becomes a subsequently Allowed Claim, shall thereafter be
distributed to such holder as provided below.

(d)    <u>Distributions to Holders of Subsequently Allowed Claims</u>.  Unless another date is
agreed on by the Debtor and the holder of a particular subsequently Allowed Claim, the Debtor
shall, within ten (10) days after an Order resolving the Disputed Claim becomes a Final Order,
distribute to such holder with respect to such subsequently Allowed Claim that amount, in cash,
from the cash held in reserve for such holder and, to the extent such reserve is insufficient, from
any other source of cash otherwise available to the Debtor, equal to that amount of cash which
would have been distributed to such holder from the Effective Date through such distribution
date had such holder's subsequently Allowed Claim been an Allowed Claim on the Effective
Date.  The holder of a subsequently Allowed Claim shall not be entitled to any additional interest
on the Allowed Amount of its Claim, regardless of when distribution thereon is made to or
received by such holder.

(e)    <u>Disputes Regarding Rights to Payments or Distribution</u>. In the event of any
dispute between and among holders of Claims and/ or Interests (including the individual or entity
or entities asserting the right to receive the disputed payment or distribution) as to the right of
any entity to receive or retain any payment or distribution to be made to such entity under the
Plan, the Debtor may, in lieu of making such payment or distribution to such entity, remit the
disputed portion of the Claim into an escrow account or to a distribution reserve as ordered by a
court of competent jurisdiction or as the interested parties to such dispute may otherwise agree
among themselves. Notwithstanding anything to the contrary, the Debtor shall make timely
distributions on account of the undisputed portion of a Claim or Interest to such claimants.

12

(f)    <u>Claims Procedures Not Exclusive</u>. All of the aforementioned Claims procedures are cumulative and not necessarily exclusive of one another. On and after the Confirmation Date, Claims which were previously disputed may subsequently be compromised, settled, withdrawn, or otherwise resolved without further order of the Bankruptcy Court.

**D.  Amendment, Modification, Withdrawal or Revocation of the Plan.**

The Debtor reserves the right, in accordance with the Section 1127 of the Bankruptcy Code, to amend or modify the Plan with such Order of the Bankruptcy Court, as may be required.

The Debtor may withdraw or revoke the Plan prior to the Confirmation Date. If such a withdrawal or revocation occurs, or if Confirmation does not occur, the Plan will be null and void. In such event, nothing contained in the Plan will constitute a waiver or release of any Claim by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any other person in any further proceedings involving the Debtor.

**E. Unclaimed Property**

Except as otherwise provided herein, in the event any claimant fails to claim any distribution within four (4) months from the date of such distribution, such claimant shall forfeit all rights thereto and to any and all future payments, and thereafter the Claim for which such cash was distributed shall be treated as a disallowed Claim. Distributions to claimants entitled thereto shall be sent to their last known address set forth on the most recent proof of claim filed with the Bankruptcy Court or, if no proof of claim is filed, on the Schedules filed by the Debtor or to such other address as may be later designated by a creditor in writing. The Disbursing Agent and the Debtor shall use their collective best efforts to obtain current addresses for all

13

claimants. The Disbursing Agent shall notify the Debtor of all returned distributions. All unclaimed cash shall be redistributed by the Disbursing Agent pro rata to the holder of Class 2 Interests.

**F. Plan Injunction**

Effective on the Confirmation Date, all persons who have held, hold or may hold Claims or Interests are enjoined from taking any of the following actions against or affecting the Debtor or assets of the Debtor with respect to such Claims, Interests or Administrative Claims, except as otherwise set forth in the Plan, and other than actions brought to enforce any rights or obligations under the Plan or appeals, if any, from the Confirmation Order:

(i) Commencing, conducting or continuing in any manner, directly or indirectly, any suit, action, arbitration, or other proceeding of any kind against the Debtor or the assets of the Debtor regarding the Claims or Interests;

(ii) Enforcing, levying, attaching, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the assets of the Debtor;

(iii) Creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the assets of the Debtor;

(iv) Asserting any setoff, right of subrogation, or recoupment of any kind, directly or indirectly, against the Debtor, the assets of the Debtor; and

(v) Proceeding in any manner and any place whatsoever that does not conform to or comply with the provisions of the Plan.

**G. Exculpation.**  Neither the Debtor nor any of its members, officers, directors, employees, attorneys, advisors, agents, representatives and assigns (the "Released Parties") shall have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, Confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the chapter 11 case or the Plan except with respect to their obligations under the Plan and any related agreement or for bad faith, willful misconduct, gross negligence, breach of fiduciary duty, malpractice, fraud, criminal conduct, unauthorized use of confidential information that causes damages, and/or ultra vires acts. Notwithstanding any other provision hereof, nothing in Sections 7.2 or 7.3 of the Plan shall (a) effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including, without limitation, any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in Sections 7.2 or 7.3 of the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against any of the Released Parties referred to herein for any liability whatever, including, without limitation, any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority, nor shall anything in Section 7.2 of the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any

15

state and local authority against the Parties referred to herein,  (b) effect a release of any claim of

SFGD or any of its affiliates, including, without limitation, any claim arising out of or under the

Guarantees executed by John Ruha and Chaim Ben Simon, dated April 17, 2007 and September

30, 2009 (collectively, the "Guarantees"), or any environmental law, nor shall anything in

Sections 7.2 or 7.3 of the Plan enjoin SFGD or its affiliates from bringing any claim, suit or

action or other proceeding against John Ruha, Chaim Ben Simon or the Debtor under or arising

out of the Guarantees or any environmental law, or (c) limit the liability of the Debtor's

professionals to the Debtor pursuant to Rule 1.8(h)(1) of the New York Rules of Professional

Conduct.

### H. Full and Final Satisfaction

Pursuant to the Plan, all payments and all distributions shall be in full and final

satisfaction, settlement and release of all Claims and Interests, except as otherwise provided in

the Plan.

### I. Retention of Jurisdiction

The Bankruptcy Court shall retain jurisdiction of the chapter 11 case:

(a)  To determine all controversies relating to or concerning the allowance of and/ or

distribution on account of such Claims or Interests upon objection thereto which may be filed by

any party in interest;

(b)  To determine requests for payment of Claims entitled to priority under Section

507(a)(2) of the Bankruptcy Code, including any and all applications for compensation for

professional and similar fees

(c)  To determine any and all applications, adversary proceedings, and contested or

litigated matters over which the Bankruptcy Court has subject matter jurisdiction pursuant to 28

U.S.C Sections 157 and 1334;

(d)  To determine all disputed, contingent or unliquidated Claims and all disputed

Interests;

(e)  To determine requests to modify the Plan pursuant to Section 1127 of the Bankruptcy

Code or to remedy any defect or omission or reconcile any inconsistencies in this Plan or

Confirmation Order to the extent authorized by the Bankruptcy Code;

(f)  To make such orders as are necessary or appropriate to carry out the provisions of the

Plan;

(g)  To resolve controversies and disputes regarding the interpretation or enforcement of

the terms of the Plan;

(h)  To determine any and all pending motions and applications for assumption or

rejection of executory contracts and leases and the allowance and classification of any Claims

resulting from the rejection of executory contracts and leases;

(i)     To resolve any disputes which may arise concerning the sale or auction of the

Property or satisfaction of the SFGD Allowed Secured Claim as required under the Plan;

(j)     To determine such other matters as may be provided for in the order of the

Bankruptcy Court confirming the Plan or as may be authorized under the provisions of the

Bankruptcy Code; and

(h)  To enter a final decree closing this chapter 11 case.

 **J. Post-Confirmation Fees, Final Decree**

17

The reasonable compensation and out-of-pocket expenses incurred post-Confirmation professional fees shall be paid by the Debtor within ten (10) days upon presentation of invoices for such post-petition professional services. All disputes concerning post-confirmation fees and expenses shall be subject to Bankruptcy Court jurisdiction.

A final decree shall be entered as soon as practicable after distributions have commenced under the Plan.

### K. Continuation of Bankruptcy Stays

All stays provided for in the chapter 11 case under Section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### L. Avoidance and Recovery Actions

The Debtor believes, after a thorough investigation and review with its counsel, that there are no causes of action under Sections 544, 547, 548, 550 and 553 of the Bankruptcy Code. As such, the Debtor does not intent to pursue any such cases of action.

### III.    FINANCIAL INFORMATION

**A. The Debtor's Schedules of Assets and Liabilities**. Schedule of the Debtor's assets and liabilities have been filed with the Clerk of the Court and may be inspected by all interested parties.

**B. Chapter 7 Liquidation Analysis.**   Because all creditors are unimpaired, no scenario exists, including but not limited to Chapter 7 liquidation, under which the creditors would be entitled to receive a distribution greater than that which the Debtor has proposed in its Plan.

18

## IV.  CONFIRMATION PROCEDURE

**A.      Voting.**  As set forth hereinabove and in the Plan, no class of Claim holders or Interests is impaired under the Plan, and accordingly, all such Classes are conclusively presumed to accept the Plan. Therefore, votes will not be solicited.

**B.      Confirmation Hearing.**  The Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan.  The Confirmation hearing has been scheduled for the date set forth on the Court Order which accompanies this Disclosure Statement.  The Confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjournment made at the Confirmation hearing. At the Confirmation hearing, the Bankruptcy Court will (i) hear and determine any objections to the Plan and to Confirmation of the Plan; (ii) determine whether the Plan meets the requirements of the Bankruptcy Code and has been proposed in good faith; and (iii) confirm or refuse to confirm the Plan.

**C.      Statutory Requirements for Confirmation of the Plan**

At the confirmation hearing, the Debtor will request that the Bankruptcy Court determine that the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code. If so, the Bankruptcy Court shall enter an order confirming the Plan. The applicable requirements of Section 1129 of the Bankruptcy Code are as follows:

(a)      The Plan must comply with the applicable provisions of the Bankruptcy Code;

(b)      The Debtor must have complied with the applicable provisions of the Bankruptcy Code;

19

(c)    The Plan has been proposed in good faith and not by any means forbidden by law;

(d)    Any payment made or promised to be made by the Debtor under the Plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the Plan and incident to the chapter 11 case, has been disclosed to the Bankruptcy Court, and any such payment made before Confirmation of the Plan is reasonable, or if such payment is to be fixed after Confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(e)    The Debtor has disclosed the identity and affiliation of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the Debtor under the Plan. Moreover, the appointment to, or continuance in, such office of such individual, is consistent with the interests of holders of Claims and Interests and with public policy. Since the Plan contemplates a liquidation of the Debtor's Property, the Debtor does not and will not operate or generate income, there shall be no post-Confirmation compensation by the Debtor to the Debtor's existing management.

(f)    Feasibility and "Best Interest" Tests: The Bankruptcy Code requires that in order to confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor (the "Feasibility Test").

For a plan to meet the Feasibility Test, the Bankruptcy Court must find that the Debtor will possess the resources to meet its obligations under the Plan. Since the Plan contemplates a liquidation of the Debtor's assets, Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtor or any successor to the Debtor under the

Plan. Until such time as the assets of the Debtor are fully liquidated, the Debtor has provided for ample reserves to ensure that there is sufficient cash on hand to satisfy the basic and critical expenses of the Debtor.

In addition, the Bankruptcy Court must determine that the values of the distributions to be made under the Plan to each Class will equal or exceed the values which would be allocated to such Class in a liquidation under Chapter 7 of the Bankruptcy Code (the "Best Interest Test"). The Best Interest Test with respect to each impaired Class requires that each holder of a Claim or Interest in such Class either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. Because all creditors are unimpaired, no scenario exists, including but not limited to Chapter 7 liquidation, under which the creditors would be entitled to receive a distribution greater than that which the Debtor has proposed in its Plan.

The Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, including the "best interest" and feasibility requirements. The Plan is "fair and equitable" and "does not discriminate unfairly". The Plan complies with all other requirements of Chapter 11 of the Bankruptcy Code and the Plan has been proposed in good faith.

**D.    Objections to Confirmation.**  Objections to confirmation must be in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector.  Any such objection must be filed with the Bankruptcy Court and served upon the following, with a copy to the Court's chambers, so that it is received

by them on or before 4:00 P.M. on the date set forth in the Court Order which accompanies this

Disclosure Statement:

DelBello Donnellan Weingarten Wise & Wiederkehr, LLP<br>
One North Lexington Avenue<br>
White Plains, New York 10601<br>
(914) 681-0200<br>
Jonathan S. Pasternak, Esq.

Objections to confirmation of the Plan are governed by Federal Rule of Bankruptcy

Procedure 9014.

## V. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.

If the Plan is not confirmed and consummated, the alternatives include: (i) preparation

and presentation of an alternative plan of reorganization; (ii) liquidation of the Debtor under

Chapter 7 of the Bankruptcy Code; or (iii) dismissal of the Chapter 11 case, which would result

in all creditor claims and rights of collection and enforcement being restored in full.

## VI. POST-CONFIRMATION REPORTS

The Debtor shall be responsible for filing post-Confirmation reports with the Bankruptcy

Court and shall pay all quarterly fees required under 28 U.S.C. § 1930 and 31 U.S.C. §3717, on

behalf of the Debtor, until the earlier of (a) conversion or dismissal of this chapter 11 case or (b)

entry of a final decree closing this chapter 11 case.

## VII. TAX CONSEQUENCES

**A.**        **Tax Consequences of Confirmation.**  Confirmation may have federal income tax consequences for the Debtor and holders of Claims and Interests.   The Debtor has not obtained and does not intend to request a ruling from the Internal Revenue Service (the "IRS"), nor has the Debtor obtained an opinion of counsel with respect to any tax matters.  Any federal income tax matters raised by Confirmation of the Plan are governed by the Internal Revenue Code and the regulations promulgated thereunder.  The Debtor, creditors and holders of Interests are urged to consult their own counsel and tax advisors as to the consequences to them, under federal and applicable state, local and foreign tax laws, of the Plan.  The following is intended to be a summary only and not a substitute for careful tax planning with a tax professional.  The federal, state and local tax consequences of the Plan may be complex in some circumstances and, in some cases, uncertain.  Accordingly, each holder of a Claim or Interest is strongly urged to consult with his or her own tax advisor regarding the federal, state and local tax consequences of the Plan, including but not limited to the receipt of cash under this Plan.

**B.**        **Tax Consequences to the Debtor.**  The Debtor may not recognize income as a result of the discharge of debt pursuant to the Plan because Section 108 of the Internal Revenue Code provides that taxpayers in bankruptcy proceedings do not recognize income from discharge of indebtedness.  However, a taxpayer is required to reduce its "tax attributes" by the amount of the debt discharged.  Tax attributes are reduced in the following order:  (i) net operating losses; (ii) general business credits; (iii) capital loss carryovers; (iv) basis in assets; (v) passive activity loss and credit carryovers; and (vi) foreign tax credit carryovers.

## VIII.  <u>NOTICES</u>

All notices and correspondence should be forwarded in writing to:

23

189 AVEC MOI LLC
P.O. Box 1225
Seaford, New York 10009
Attn: John Ruha

with a copy to:

DELBELLO DONNELLAN WEINGARTEN
    WISE & WIEDERKEHR, LLP
One North Lexington Avenue
White Plains, New York 10601
Attn: Jonathan S. Pasternak, Esq.
    Erica Feynman Aisner, Esq.

If to SFGD, Inc.

SFGD, LLC
c/o Stabilis Capital Management, LP
765 Fifth Avenue, 12th Floor
New York, New York 10153
Attn: Joseph J. Tuso

with a copy to:

THOMPSON & KNIGHT LLP
900 Third Avenue, 20th Floor
New York, New York 10022
Attn: Michael V. Blumenthal, Esq.

## X.  RECOMMENDATION

The Debtor believes that Confirmation of the Plan is preferable to any of the alternatives

described above.  The Plan will provide greater recoveries than those available in liquidation to

all holders of Claims.  Any other alternative would cause significant delay and uncertainty, as well as substantial additional administrative costs.

Dated: White Plains, New York
     June 11, 2013

189 AVEC MOI, LLC

By: __*/s/ John Ruha*_____
     John Ruha, Managing Member

DELBELLO DONNELLAN WEINGARTEN
WISE & WIEDERKEHR, LLP
*Attorneys for the Debtor*

BY_____*/s/ Jonathan S. Pasternak*_____
     Jonathan S. Pasternak, Esq.
     One North Lexington Avenue
     White Plains, New York 10601
     (914) 681-0200